

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MRM:JRS
F. #2023R00567

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 26, 2024

<u>By ECF</u>

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Markel Washington
     <u>Docket No. 24-CR-51 (AMD)</u>

Dear Judge Donnelly:

   The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for Tuesday, December 3, 2024 at 10:30 a.m. On August 13, 2024, the defendant pled guilty to bank fraud, in violation of 18 U.S.C. § 1344.

   The defendant's criminal conduct was no ordinary fraud. Washington, along with two codefendants, schemed to defraud an attorney who serves on the Criminal Justice Act ("CJA") Panel in this District. After wrongfully obtaining the most sensitive personally identifiable information ("PII") about the CJA attorney, the defendants impersonated the CJA attorney and opened fraudulent bank accounts in the CJA attorney's name over which they had full control. Then, they attempted to deposit into those accounts a $125,386.81 check that had been stolen from the CJA attorney. This check was issued by the Department of the Treasury and intended to reimburse the CJA attorney for representing indigent defendants as court-appointed counsel in this District.

   Particularly troubling about Washington's criminal conduct is that he took certain acts necessary to further this scheme on the very same day that he was arraigned on a nine-count indictment in Bronx Supreme Court. Those charges stemmed from his attempt to flee investigators who had responded to the scene of an assault he was alleged to have committed. When a police sergeant attempted to speak with him, Washington recklessly drove away as the sergeant hung onto the side of his moving car.

   Time and time again, Washington has demonstrated his total disregard for our criminal justice system and the hardworking professionals who dedicate their lives to furthering it. For these reasons, and those set forth in additional detail below, a sentence of 21 months of imprisonment, which is at the top of the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range, is appropriate here.

I.     Background

    A.     The Instant Offense

As part of this scheme, Washington and his codefendants, Ada Tavarez and Tyquan Robinson, conspired to steal the identity of a CJA attorney and then cash a stolen check reimbursing the CJA attorney for representing indigent defendants as court-appointed counsel. See Presentence Investigation Report ("PSR") at ¶ 5.

On June 22, 2023, Washington's co-defendant, Tavarez, visited a local bank branch and impersonated the CJA attorney. Id. at ¶ 7. She presented the bank teller with doctored identification documents, including a driver's license with her photograph but with the CJA attorney's name and birthdate as well as a fraudulent Social Security card and a fraudulent Internal Revenue Service W-9 form, both of which contained the CJA attorney's personal identifiers. Id. Unbeknownst to the CJA attorney, Tavarez successfully opened multiple bank accounts in the CJA attorney's name—accounts over which the defendants had full control.

Four days later, on June 26, 2023, Tavarez returned to the bank, again impersonating the CJA attorney. This time, Tavarez presented the bank with a stolen $125,386.81 check and attempted to deposit it into the newly opened fraudulent accounts in the name of the CJA attorney. Id. at ¶ 9. This check, issued by the Department of the Treasury, was intended to reimburse the CJA attorney for work on behalf of criminal defendants who cannot afford an attorney to represent them. The stolen check stated, "Pay to the order of [CJA attorney's name]," underneath was printed the mailing address of the CJA attorney's law office. Id. at ¶ 6. The reverse of the check also contained a forged signature for the CJA attorney.

The next day, June 27, 2023, Washington signed into the online portal for the fraudulent bank accounts that Tavarez had opened in the CJA attorney's name. Id. at ¶ 10. Washington's cellphone also made three telephone calls to the bank. Id. During these recorded calls, the caller impersonated the CJA attorney and inquired as to why the bank had not yet cleared the check. Id.

Ultimately, the bank flagged the defendants' actions as fraudulent and declined to process the check stolen from the CJA attorney. Nevertheless, the defendants' criminal conduct forced the CJA attorney to undergo a months' long ordeal to restore their identity and recoup the funds to which they were entitled. As described in further detail in the CJA attorney's attached victim impact statement, a replacement check was not issued until over seven months following the issuance of the original check. See Exhibit A. During this period, the CJA attorney did not receive a single penny of the $125,386.81 to which they were entitled for their hard work on behalf of indigent defendants. In addition, the CJA attorney was forced to expend significant time and effort in restoring their identity, monitoring their credit, and proving that they had been the victim of fraud by consulting with and filling out forms submitted to the bank, the court, the Office of Defender Services, the Department of the Treasury, and the Department of Justice. PSR at ¶ 16.

Washington's involvement was vital to the perpetuation of this scheme. First, he recruited Tavarez to take on the identity of the CJA attorney. Notably, Tavarez is thirty years older than both Washington and his codefendant, Robinson. As demonstrated through the numerous

pretrial violations that have occurred during the pendency of this case, Tavarez is battling a serious drug addiction. The investigation has shown that Washington promised Tavarez $10,000 if the stolen check cleared. He also coached her to memorize the CJA attorney's PII before going into the bank. Toll records for Tavarez and Washington corroborate that they were in communication with one another during the scheme. As part of this investigation, law enforcement agents also reviewed Washington's Apple iCloud account pursuant to a search warrant. Saved in Washington's iCloud account were four headshots of Tavarez—including the same headshot that was printed on the fraudulent New Jersey driver's license containing the CJA attorney's name and birthdate that was submitted to the bank. PSR at ¶ 10.

The investigation has also shown that Washington intimidated and fought with Tavarez because the stolen check ultimately did not clear. This behavior continued at the police precinct following Washington's arrest. Before she was interviewed by law enforcement officers, Washington and Robinson told Tavarez, in sum and substance, "don't say shit." Id. at ¶ 17. Additionally, after Tavarez was questioned by law enforcement officers, a member of law enforcement overheard Washington say to Tavarez again, in sum and substance, "don't say shit." Washington then scolded Tavarez, in sum and substance, "you didn't say anything, right?" Id.

Investigators have reviewed cellphones seized from Washington and Robinson at their arrests. These devices contained communications that suggest that Washington was Tavarez's "handler." For example, messages reflect how Washington needed to provide Robinson with Tavarez's telephone number because Robinson did not have it. In the days leading up to Tavarez's first visit to the bank, Robinson instructed Washington that he needed to "[m]ake sure she ready bro." Washington then reported back to Robinson that he had knocked on Tavarez's door and that "[s]he getting ready." A few days later, Washington reported to Robinson that "[s]he said she's coming down rn." On two occasions following the events at the bank, on July 20, 2023 and August 2, 2023, Washington sent Robinson Tavarez's address. Then, on August 18, 2023, Robinson instructed Washington, "Grab that phone from Aida [i.e., Tavarez] bro."

On February 7, 2024, the defendant was arrested and arraigned on the above-captioned indictment, which charged him with: (1) conspiracy to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349, and (2) bank fraud, in violation of Title 18, United States Code, Section 1344. He was also detained pending trial. During his initial appearance, Washington represented that he could not afford an attorney. Accordingly, the Court appointed a member of the CJA Panel to serve as his counsel in this matter.

B.    The Defendant's Criminal History

Notably, when the events charged in the indictment took place, Washington had recently been charged in a still-pending criminal matter in Bronx Supreme Court and was on pretrial release. The pending Bronx charges arose from Washington's criminal conduct on April 23, 2023. That day, police officers responded to a 911 call of an assault in progress. Upon arrival to the location reported by the 911 caller, one officer attempted to speak to Washington, who had been identified as the assailant. Washington, however, ignored the officer and entered his car. He then tried to start the ignition in an effort to escape. When a police sergeant attempted to grab his keys to stop him from fleeing, Washington accelerated the car as the two continued to struggle for the keys. Washington then started to drive away while the sergeant held onto the car. After

3

Washington crashed into a fixed object mounted to the sidewalk, he reversed his car, with the sergeant still hanging on. Washington then fled on foot.

On May 28, 2024, this Court held a hearing regarding Washington's eJustice indicates that he was not arrested on these charges until May 15, 2023—nearly one month later. A review of Washington's communications saved in his iCloud suggests that he had intentionally evaded law enforcement before his arrest. For example, on May 1, 2023, Washington informed someone that "detectives contacted me they want me to[] turn myself in on the 3rd." The recipient of his message responded, "How they get your info I thought you turned that phone off." Similarly, three days after his arrest, Washington wrote to someone: "I was on the Run so I couldn't be on social media but that's behind me now."

On May 24, 2023, a grand jury sitting in the Bronx returned a nine-count indictment, charging Washington with: (1) Attempted Assault in the First Degree: Intent to Cause Serious Injury with a Weapon; (2) Assault in the Second Degree: Intent to Cause Physical Injury with a Weapon/Instrument; (3) Attempted Assault on a Police Officer/Fireman/EMT; (4) Assault in the Second Degree with Intent to Cause Injury to an Officer/Fireman/EMT/Nurse/Crossing Guard; (5) Reckless Endangerment in the First Degree; (6) Attempted Assault in the Second Degree: Intent to Cause Serious Physical Injury; (7) Assault in the Third Degree: Intent to Cause Physical Injury; (8) Reckless Endangerment in the Second Degree; and (9) Reckless Driving. Washington was arraigned on these charges on June 22, 2023—the very same day that Tavarez opened the fraudulent bank account using the CJA attorney's stolen identity.

On May 28, 2024, this Court held a hearing regarding Washington's appeal of his order of pretrial detention. During this proceeding, the Court watched body worn camera footage from a police officer on scene who had observed Washington driving away with the sergeant hanging onto the side of his car. The Court summarized this video as follows:

> Two officers, uniformed police officers, responding to a reported, I believe it was an assault, tried to question Mr. Washington. He had options. He could have declined to speak with them, that was his right. Instead, he pushes the Sergeant out of the way, gets into his car. And when she tries to stop him, he reverses with her still on the car. He crashes into something and speeds away. I know Mr. Washington has told his counsel that he this was a fear reflex. I don't credit that. He did not look like he was fearful. He looked like he wanted to get away. It was a vivid depiction of someone who was willing to go to great lengths to escape, including risking injury, serious injury, not just to the officer who was there but to anybody who happened to be in his path.

(May 28, 2024 Tr. at 20:2-15).

4

II.    <u>Applicable Law</u>

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted).

Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the Guidelines range is reasonable.  [The court] must make an individualized assessment based on the facts presented."  <u>Id.</u> at 50 (citation and footnote omitted).  Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider."  <u>United States v. Alexander</u>, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III.  Analysis

    A.  Sentencing Calculation

        The Guidelines Offense Level, as calculated in the PSR, and to which the defendant stipulated in the plea agreement, is as follows:

| | | |
|---|---|---|
| Base Offense Level (§ 2B1.1) | | 7 |
| Plus: | Loss greater than $95,000 (§ 2B1.1(b)(1)(E)) | +8 |
| Plus: | Unauthorized use of identification (§ 2B1.1(b)(11)(C)) | +2 |
| Less: | Timely Acceptance of Responsibility (§ 3E1.1(a)) | - 3 |
| | Total: | 14 |

PSR ¶¶ 20–30.  The defendant is in Criminal History Category I.  Id. ¶ 33.  Accordingly, the applicable Guidelines range is 15 to 21 months of imprisonment.  Id. ¶ 59.  This Guidelines range is consistent with the range estimated by the parties in the defendant's plea agreement.

    B.  A Top of the Guidelines Sentence is Appropriate

        The starting point at sentencing, in this as in every case, is the recommendation of the Sentencing Commission embodied in the Guidelines calculation.  "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances.").  That is because "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale."  Rita v. United States, 551 U.S. 338, 348 (2007).  However, sentencing courts "may not presume that the Guidelines range is reasonable" because the final assessment must be individualized.  Gall, 552 U.S. at 39; see also Rita, 551 U.S. at 351 ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."); cf. id. at 352–55 (explaining why appellate courts—unlike sentencing courts—may presume the reasonableness of Guidelines sentences but may not presume unreasonableness of non-Guidelines sentences).

        Here, the Section 3553(a) factors weigh in favor of a significant sentence.  First, the nature and circumstances of Washington's offense are extremely serious, as this Court previously recognized during his bail appeal hearing.  As the Court explained then, "Stealing someone's identity, anyone's identity, and impersonating that person, stealing money from them, large amounts of money from them, is serious conduct that upends that person's life.  And as I said, I don't think there is any dispute about that."  (May 28, 2024 Tr. at 19:5-9).  Washington and his codefendants possessed and misappropriated the most sensitive personal information that

belonged to an innocent third party. They imposed an emotional harm on a vulnerable person who lacked the agency to control the manner in which their identity would be used and how their data would be disseminated. Moreover, Washington and his codefendants demonstrated a total disregard for the possibility that this individual might suffer tangible financial harm because of their actions. By using this person's identifiers to open bank accounts that were then used to commit fraud, the defendants' actions risked imposing lifelong and devastating consequences to the victim. For example, Washington and his codefendants jeopardized the victim's ability to pay for the necessities of life, apply for a loan, rent an apartment, purchase a home, or pass a background check to begin employment. Given that the bank flagged the accounts the defendants opened in the victim's name as fraudulent, the victim also had to expend significant time and resources proving their innocence to avoid any restriction on their future ability to bank. Not only did Washington and his codefendants steal the victim's identity, but they stole the victim's entire livelihood as well. Because of Washington's greed, the victim suffered a devastating financial loss and was deprived of $125,386.81 in income for seven months. Significantly, this check was payment for hundreds of hours of hard work that the victim had expended on behalf of indigent defendants as court-appointed counsel.

By stealing the CJA attorney's identity and salary, Washington demonstrated a total disregard for our criminal justice system and the important work that all of its participants perform on behalf of the public interest. Because of Washington's criminal conduct, the CJA attorney diverted time and attention to restoring their identity and seeking to recover the significant funds to which they were entitled—time and attention that otherwise would have been spent zealously advocating for indigent clients. The Clerk of Court, the Administrative Office of the United States Courts, and the Department of the Treasury, too, were distracted from their core functions in order to investigate the defendant's criminal conduct. It is beyond dispute that Washington's criminal behavior detrimentally impacted the integrity of our criminal justice system and harmed those who dedicate their professional lives to furthering it. This behavior, coupled with his prior criminal conduct in which he dragged a police sergeant hanging onto the side of his car, warrants a significant sentence in order to "to promote respect for the law." See 18 U.S.C. § 3553(a)(2)(A).

Furthermore, deterrence is particularly relevant here. Incidents of check theft and check fraud unfortunately continue to grow, both nationwide and within this District. The New York Times recently published a series of articles detailing the sophisticated networks involved in this criminal conduct and the devastating and life-altering effects that these perpetrators inflict on their vulnerable victims.[1] This problem has become so rampant that more and more participants in the criminal justice system have been victimized by the theft of checks reimbursing them for their work. To date, the government's investigation has identified over $1 million in checks issued by the Department of the Treasury on behalf of the Administrative Office of the United States

---

[1]    See, e.g., Tara Siegel Bernard, We Can't Stop Writing Paper Checks. Thieves Love That, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/business/check-fraud.html?smid=nytcore-ios-share&referringSource=articleShare; Ron Lieber, Stolen Checks Are for Sale Online. We Called Some of the Victims, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/business/stolen-checks-telegram.html?smid=nytcore-ios-share&referringSource=articleShare.

Courts that have been stolen and deposited into unauthorized accounts since 2021. The intended recipients of these checks include court-appointed criminal defense attorneys, paralegals, investigators, translators, court reporters, and jurors. Washington is one of eight defendants who have been charged with stealing and depositing CJA checks in this District alone. See also United States v. Reid, et al., 24-CR-49 (NRM) and United States v. Lipscomb, et al., 24-CR-139 (EK). The government's investigation continues, and additional defendants are expected to be charged in the months to come, both in the Eastern District of New York and elsewhere.

    Given the pervasiveness of these thefts, the Court should impose a significant sentence to deter other would-be thieves from upending the lives of any additional vulnerable people. Notably, several members of the CJA Panel agree with this recommendation, as detailed in their attached submissions. See Exhibits A-C. As these CJA panelists note:

- "This is a systemic problem nationwide, lacking sufficient deterrents to prevent this kind of predatory behavior. There is no consequence for these thieves, and therefore no deterrence, so the free-loaders like these defendants, who steal hard-working people's money, are brazen enough to steal my identity without any regard for how my life is impacted by their selfish and aggressive criminal behavior."

- "The Court must ensure the need for a robust judicial response to such crimes to underscore the unacceptable conduct of stealing CJA funds and a person's identity. This Court needs to send a powerful message that there are real consequences for these types of crimes and thieves who prey on hard-working members of our community. If there is going to be any deterrence whatsoever, given how widespread the stealing of CJA checks is, then imprisonment for each defendant is necessary to reflect the seriousness of the defendants' conduct, promote respect for the law, provide just punishment for the offense, and accomplish general deterrence to those who, like defendants Tavarez, Robinson and Washington, who are pariahs of our society, plan and participate in these crimes."

- "I'm angered and saddened by what these defendants put me and my family through. I believe some amount of incarceration is appropriate for each defendant. Their conduct showed a willingness to repeatedly inflict both financial and psychological harm against me and others. Their conduct was deliberate and premeditated. They stole instead of earning, showing no concern for anyone other than themselves."

- "This is not a 'victimless crime.' It is stealing, the same as if the person robbed a bank. My check represented months of work. It felt like a personal violation by the very people I work to defend. I have met so many talented and dedicated professionals in the CJA program but I could understand that this kind of personal violation would make some people not want to be part of the program, which would be a real loss."

In addition to a term of incarceration, a lengthy term of supervised release is warranted here to ensure that the defendant lives a law-abiding life, particularly given his repeated disregard of the criminal justice system, as demonstrated both in this case and in his pending case in the Bronx. The defendant's criminal history also weighs in favor of Court-mandated community service as part of his sentence. Performing community service will allow Washington to gain better insight into the lives and experiences of those whom he victimized through his crimes: individuals who sacrifice their time and talent on behalf of the public good to better their communities.

IV.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence at the top of the applicable Guidelines range.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/ James R. Simmons
James R. Simmons
Assistant U.S. Attorney
(718) 254-7511

cc:    Clerk of the Court (AMD)
United States Probation Officer Erica Vest
Counsel of Record (by ECF)

# Exhibit A

October 31, 2024

Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      **Re:**    **United States v. Tavarez, Tyquan Robinson, Markel Washington
Indictment No. 24 Cr. 51 (AMD)**

Dear Judge Donnelly:

      I am CJA Lawyer Victim-1, and I write to respectfully request that the Court consider the contents of this letter in its determination of an appropriate sentence for the defendants, each of whom merits a sentence of imprisonment necessary to meet the purposes of sentencing set forth in 18 U.S.C. §3553(a) based on their individual and collective criminal conduct.

      I am a member of the CJA Panel in the Eastern and Southern Districts of New York and serve as court-appointed counsel for indigent defendants, who cannot afford an attorney to represent them in federal criminal prosecutions.

**<u>Background</u>**
      On or about May 23, 2023, the Treasury Department issued a check for $125,386.81. This amount represented services rendered on behalf of a capital CJA client for almost a year's worth of work. The check was made payable to me and my Law Offices in Brooklyn, which also listed my name on the check, and was mailed to my office address in Brooklyn. However, the check was intercepted by defendants Robinson, Washington, Tavarez, and others. Because I was a victim of this fraudulent scheme previously (*see United States v. Reid*, et al., 24 Cr. 49-NRM), I tried to stop the disbursement of the check from being paid to the defendants, by calling the U.S. Treasury Department who had issued the check. I was advised by the U.S. Treasury Department on June 12, 2023, that I would have to wait until June 23, 2023, to make a request for a stop payment on the check. I did so, but it was too late. The check had been presented to Citibank for payment by someone who had presented false photo identification documents purporting to be me.

      Once I received a copy of the deposited check from the Treasury Department, I learned the following: someone had forged my name on the back of the check and **deposited it to a Citibank account #12022210779, and said check was posted on June 26, 2023.** I called Citibank and was connected to their San Antonio, Texas, fraud division and asked them to place a "hold" on the check because I was the rightful owner of the check. I was asked to submit verifiable proof of my identity, which I did, along with my business card establishing my office address. On July 11, 2023, Citibank sent me a 6-page claim form to be completed with additional information and proof of my signature, all of which had to be notarized. On July 24, 2023, I received written confirmation from Citibank that their investigation was completed and

acknowledged that I was the victim of fraud.

In order to be reimbursed, the Treasury Department required me to complete a claim form, and regardless of what they already knew because they, too, were in contact with Citibank, they had to do their own internal investigation, which takes 90 days. I completed the first claim form and mailed it to the Financial/Accounting Division of the Treasury Department, but after three months, I was advised they had not received my claim form. I submitted another in October 2023 and then located someone in the Office of Defender Services to escalate my claim, given the passage of time. This took many hours over the course of several months, including multiple emails to various individuals, including our local CJA Clerks, and multiple phone calls to the various stakeholders, all in an effort to get the matter resolved. On December 6, 2023, I was reimbursed the full amount of the stolen check.

To be clear, I do not know any of the defendants and did not give defendant Tavarez permission or authority to deposit my money into her fraudulent bank account. This level of detail is submitted to the Court to give the Court an understanding of the time-consuming effort that counsel had to expend as a result of the defendants' criminal enterprise.

I have since learned that defendant Tavares entered Citibank on or about June 22, 2023, and presented a photo of herself purporting to be me, using my personal identifying information, including my name, social security number, date of birth, and completing an IRS tax form (W-9) and opened a bank account. On June 26, 2023, defendant Tavares deposited my stolen check into this fraudulent bank account and forged my signature on the back of the check.

Defendant Tavares did not act alone. Each defendant-participant's role was crucial to the success of this fraud, and all of the defendants had access to my personal information. Because of their criminal conduct, including the theft of my identity as reflected in Count Three of the indictment, my personal information has been compromised such that my credit card information has been stolen, unauthorized use of my credit card information to make unauthorized purchases is now common practice from people I do not know, the opening of bank accounts in my name without my permission and authority is now occurring, unauthorized use of my social security number is now common-place and monitoring my personal information through the various credit agencies and banks, as well as my credit card companies is now a full-time job. It is exhausting. The financial strain and psychological toll the theft of this check caused cannot be overstated. The theft not only deprived me of timely access to my rightful earnings but also imposed a lingering sense of vulnerability, which has become a reality given the frequent notifications I now receive that my information has been compromised.

Regrettably, this is not an isolated incident. I have had other checks stolen since then, and so have many CJA lawyers and CJA service providers who provide services on behalf of CJA clients. This is a systemic problem nationwide, lacking sufficient deterrents to prevent this kind of predatory behavior. There is no consequence for these thieves, and therefore no deterrence, so the free-loaders like these defendants, who steal hard-working people's money, are

brazen enough to steal my identity without any regard for how my life is impacted by their selfish and aggressive criminal behavior. Defendant Tavarez' walked into a bank and scammed the bank and me out of money she knew she did not earn. In order for this enterprise to succeed, each individual had a specific role, and the Indictment describes some of the conduct of each defendant in perfecting this sophisticated scheme. Defendant Tavarez was especially callous in her conduct. She possessed a fake identification document and, with that fake document, marched into the bank and opened a fraudulent bank account with the stolen money that she and her cohorts intended to access for their own benefit once the funds became available. Her conduct, as well as that of the two other defendants, were purposeful, calculated, and intentional, and they showed a complete disregard for their victim that she and her cohorts not only stole from, causing financial hardship, but caused CJA-Lawyer-1 to suffer irreparable harm from the theft of her personal information which is now in the public domain.

The Court must ensure the need for a robust judicial response to such crimes to underscore the unacceptable conduct of stealing CJA funds and a person's identity. This Court needs to send a powerful message that there are real consequences for these types of crimes and thieves who prey on hard-working members of our community. If there is going to be any deterrence whatsoever, given how widespread the stealing of CJA checks is, then imprisonment for each defendant is necessary to reflect the seriousness of the defendants' conduct, promote respect for the law, provide just punishment for the offense, and accomplish general deterrence to those who, like defendants Tavarez, Robinson and Washington, who are pariahs of our society, plan and participate in these crimes. As a condition of supervise release, the Court should consider imposing a significant number of community service hours so that these defendants who are freeloaders can learn the value of personal responsibility.

I hope that the Court will consider my experience and the broader implications of the case in determining an appropriate sentence for each defendant that reflects the severity of this conduct and serves as a deterrent to others.

I am grateful for the Court's time and consideration of this matter.

Respectfully submitted,
/s/
CJA Lawyer Victim-1

# Exhibit B

October 20, 2024

Your Honor,

I'm angered and saddened by what these defendants put me and my family through. I believe some amount of incarceration is appropriate for each defendant. Their conduct showed a willingness to repeatedly inflict both financial and psychological harm against me and others. Their conduct was deliberate and premeditated. They stole instead of earning, showing no concern for anyone other than themselves.

Being a criminal defense lawyer has given me some insight into criminality. It would be naïve to believe that the defendants have sufficiently evolved at this stage of the criminal process. Hopefully, they are working on reforming themselves, but I'm confident they are primarily sorry they were caught. Remorse requires more than words. This Court must help the defendants develop a sense of social responsibility and concern for others they lack by imposing adequate punishment.

Why is incarceration necessary?

First, to gain empathy, a person must often lose something dear to them. Time is such an item. I'm sure the defendants value it. And, of course, there is the symmetry here. These defendants stole our time, so now they should pay that debt.

Second, to foster empathy, a wrongdoer must often experience what their victims went through. The transformative potential of even a short prison stay will give the defendants the experience of preparing their affairs for prison. They will have to deal with unknown challenges and rebound and rebuild. Again, there is symmetry here, as I spent many worried hours repairing the financial chaos they deliberately inflicted on me.

Third, deterrence is sorely needed. These thefts continue to this day. They attacked core values that hold our society together. So, a strong message must be sent that these crimes will not be tolerated and will be punished to deter others. Their free coconspirators are looking at the punishments leveled in these first cases, and what this Court does matters.

Finally, it is fair. Let me explain by comparing these defendants to a young, low-level drug dealer I represented. I'll call him John. He sold crack cocaine in a conspiracy. He was just a kid who had had a tough life. No parental guidance. Inadequate schools and opportunities. Death and despair in his family. He had been living on the street, fending for himself. He sold crack cocaine, not a good choice, but a choice that showed less culpability than these defendants because his crime possesses some level of moral ambiguity, given the mixed messages our society sends about drugs and alcohol, given the legality of cigarettes, pharmaceutically available medications for mental health, and the prevalence of painkillers.

1

The same cannot be said about these defendants. There is no ambiguity about their conduct. This was not a mistake or a victimless crime. They knew this was an invasion. Each check they stole had a name upon it whose signature was forged. They pretended to be me and others out of greed. They knew we weren't faceless corporations. They knew they were disrupting our lives, risking our businesses' and families' well-being.

Now, for selling a few grams of crack, John was sentenced to the mandatory minimum of 10 years. And the judge let her disagreement with the sentence be known: "We're going to warehouse this young man for ten years." I'll never forget those words because while John showed his grace at his sentencing, which buoyed my spirit, he had to pay more than his fair debt. He wasn't a schemer. He wasn't a fraud. He didn't steal what didn't belong to him. He didn't steal identities. He didn't forge signatures. He didn't defraud banks, check-cashing businesses, and taxpayers.

I would trust John before these defendants because he was misguided, while the defendants acted with malicious intent.

Put another way. We've debated legalizing drugs, but we've never debated legalizing theft.

Your Honor, I want to make this final suggestion that after serving a sentence in jail, each defendant should be required, under 18 U.S.C. § 3563(b)(12), to "work in community service as directed by the court." Perhaps 150 to 200 hours. I think these defendants must develop as human beings. I'm sure you know that working for others is the only way a person becomes more compassionate and courageous. Ultimately, we want these defendants to learn to empathize and care about others, even strangers - and talk won't cut it.

As my cousin used to say, they need: "Skin in the game."

This approach is not just about serving the community but also about providing a platform for these individuals to grow personally, a growth they desperately need.

Sincerely,

/s/ CJA Attorney Victim

2

# Exhibit C

I am a Certified Fraud Examiner, but I now know firsthand what it means to be a victim of fraud. I am passionate about my work as a financial analyst for attorneys representing CJA clients.

Clients are entitled to the best defense, regardless of their ability to pay.  That's an integral part of the workings of our justice system.  Once a client is found guilty, an equally important part of the justice system is an appropriate sentence.

This is not a "victimless crime."  It is stealing, the same as if the person robbed a bank.  My check represented months of work.  It felt like a personal violation by the very people I work to defend.  I have met so many talented and dedicated professionals in the CJA program but I could understand that this kind of personal violation would make some people not want to be part of the program, which would be a real loss.